James. Oh, yeah. Oh, yeah. Oh, yeah. The Honorable Appellate Court, 5th District State of Illinois is now in session. The Honorable Justice Barbera is presiding along with Justice Welch and Justice Warden. The first case this morning is number 519-0358, People v. James. Arguing for the appellant, Damondros James, is Unsam Nam. Arguing for the appellee, People of the Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk is permitted to record these proceedings. Good morning to both of you. Good morning, Your Honor. You are ready to go, Appellant. We're ready to listen. Thank you, Your Honor. May it please the Court, Council, Assistant Appellate Defender, Unsam Nam, on behalf of Damondros James. There are two arguments on appeal. The focus today will be on the second argument regarding Damondros' sentence. The issue before this Court is whether Damondros' 50-year de facto life sentence is unconstitutional as applied to him, given that he was barely 18 years old at the time of Charles Ellis' death. Or if his 50-year sentence was excessive, where the trial court failed to consider his youth and rehabilitative potential. One of the most fundamental aspects of these Miller line of cases for juvenile sentencing, which is being extended to emerging adults and late teens, like Damondros, who was 18 at the time of Mr. Ellis' death, is that youth and its attendant characteristics like impetuosity, immaturity, recklessness, being less blameworthy, these transient features of youth are mitigating. And that these considerations apply to even those juveniles or emerging adults who commit heinous crimes like murder. And that's what we have here. After attempting to rob 75-year-old Charles Ellis, a cab driver, four teenagers, including Damondros, caused Ellis' death. However, the signatures of youth diminished the justification to incapacitate, to give him the harshest penalties. And thus, Damondros asks that his de facto life clause, because it offers no incentive, no chance for him to be rehabilitated or restored to useful citizenship. And he also asked that this court find it excessive and ask for a new sentencing hearing. Again, Damondros isn't trying to diminish or minimize the seriousness of the crime here. A 75-year-old cab driver who was just working that night lost his life. But as Damondros asked in his briefs, he asked for consideration of his youth here. And as I'll get to the facts, the trial court here really discussed Ellis' age and talked about how our, us as a society, we as a society need to protect those like Ellis. But we as a society also have a duty to juveniles and emerging adults like Damondros, who was barely 18 at the time of this incident, to protect them as well. Just to reiterate some of the relevant facts here, Damondros had just turned 18. He had a GED. He had attended Lincoln Challenge Academy, where I know some kids go if they're forced to go. But in Damondros' case, he stated that he voluntarily went as a pre-military type of academy. He was thinking about joining the National Guard. He was skilled in welding and art, so he wanted to do construction. At the time, he was working full-time at Continental Tires in Mount Vernon. And I believe he just started taking some classes at Renly College. So this is kind of Damondros in a brief picture of him. And we have Damondros, who has no criminal They're 15, 18, and 18, respectively. He begins hanging out with them, and these three are not new to the criminal justice system. I believe that sentencing detective Jeff Buller from the Mount Vernon Police Department testifies that these three have been in trouble before, that he knows them, that they've gotten in trouble together before. And he says that Damondros must be new to the group, that Damondros is the odd one out. He begins hanging out with this group, these teenagers. And on May 31, 2011, the four of them decide that it would be a good idea to rob or scare taxi drivers out of their cab fares. And as the record shows, cab fares in Mount Vernon are $4 a fare. So they decide, the four of them, that they're going to get some money from these taxi drivers. Excuse me one moment, Ms. Nam. Yes, Your Honor. The four of them decided, you said, but was this one specific individual's idea initially? Do you know? I'm sorry, Your Honor. I can't recall whose idea it was. I can come back on rebuttal if I can find that. Let me interrupt for one second. You indicated, you just said that on May, what was it? 31st. May 31st that they decided to rob a cab. Wasn't there evidence that they had done a practice run prior to this man's death? Yes, Your Honor. But I believe it was that same day, just earlier that day. So they were attempting, as far as I remember, I think they were attempting to rob cabs and they tried it once and it was unsuccessful. They either got scared or it didn't work out. So they tried again. And I think this shows the thoughtless nature, the immaturity, the recklessness, the failure to consider the consequences, the riskful nature of what they're doing. It also shows the opposite, that they're planning ahead and running through a practice run, right? So I believe it was Detective Bullard who said he believed it was a practice run, but it could have just been that they tried it. It wasn't a practice run. They tried it and it just wasn't successful. It wasn't that they were trying it out a few times and trying to find the right victim, I guess, in this case. But Detective Bullard does state it that way, does testify that way. We don't know for a fact. There was no testimony from any of the defendants that it was a practice run. It was the officer's opinion that it may have been. And it's maybe your opinion that it was a botched first attempt. That's true, Your Honor. It was, right. So Detective Bullard was the one that stated he thought it was. Now, so far you haven't mentioned, weren't there two weapons involved? Yes, Your Honor. Yes, Your Honor. And did not the defendant here, didn't he file a shot that was considered the death shot? And it was a .22, I think? So, Your Honor, you're correct. So I guess to kind of break that up a little bit, I think one of the issues that DeMondros raises is he, so there were two guns that were used. Of course, our argument is that DeMondros was the odd one out and the three co-defendants who are close friends or have gotten in trouble together before, they blamed my client, DeMondros, as the one holding the .22 and firing the .22, which the evidence stated killed Mr. Ellis. But again, one of the arguments that we make is that DeMondros asked to have his own expert kind of look at the evidence. So there was a .38, there was a .22, there was ammunition from the .22 and the .38, or .380, .380. And he wanted his own expert to look at it. It seems that from transport between Mount Vernon Police Department to the expert, I believe in Texas, the defense's expert in Texas, they lose this evidence that is needed. So that's a part of our first argument is that they don't have this gun. They don't have a, they didn't, they never found the .22 caliber gun that they're saying or shot and killed Mr. Ellis, but also they lost evidence. And they're, it's, they're not saying, we're not faulting anyone for it, but the evidence was lost in the transport as well. So that's kind of where that breakup happens of that .22 being the one that killed Mr. Ellis. But DeMondros from the beginning stated that he wasn't the shooter or he wasn't the one that killed Ellis. He also stated that he'd never had a .22 pistol and that the boxes of ammunition that they found under his bed wasn't his either, right? That's true, your honor. But the state was the same ammunition as what was found. Is that correct? That's correct, your honor. Excuse me. I don't think that they said it was the same. They said that it was consistent. Consistent with the same ammunition, right? And that's what I was going to ask. I mean, what does that mean? I'm curious. That's what I was wondering. Another .22 bullet. It, it was a long rifle, short rifle. I don't know. I didn't see the police report, but I was just having a question about what consistent actually meant. Supposedly there was an agreement between defense council and the police that if the item was lost, which I thought was kind of curious, that they would agree to substitute photographs of the particular projectile. Is that correct? That's true, your honor. I don't have the exact page, but in our reply brief, we discussed that a little bit at length. So your honors are correct. They said it was consistent. And I believe that's, that was the reason why the defense wanted their own expert to send this out to Texas for their own expert to look at, to determine it since the weapon that actually fired that shot wasn't discovered. So they never found that weapon. So all they have is this ammunition under DeMondros' bed, which again, he claims wasn't his and they have the shot in Mr. Ellis. And they wanted to do that comparison, but they weren't able to. And again, the photographs were not admitted at any point. And of course this didn't go to trial or anything, but there was still an evidentiary hearing at the sentencing portion and the photos were not admitted. Okay. Well, I think we've run out of time, but you'll have a reply. So thank you. If you're ready, we're ready for you. Thank you, your honor. May it please the court. I am Assistant Attorney General Gopi Kashyap on behalf of the people. I'd like to just start with some of the questions that the court asked as to whether it was one specific individual's idea. The evidence suggests based on the record we have, that they all kind of worked together. I think Black contacted a defendant at some point and Black was the one who was using his cell phone to call the cab. But I don't think there's a specific indication as to whose particular idea this was. And I think the court asked about whether a defendant, they had a, a test run or whether this was a failed attempt. There is evidence from, I think it's detective Bullard and perhaps it's in some of the pretrial hearings, but the evidence is that Sluder, the original cab driver that was called and the person they originally tried to rob at gunpoint kind of picked up on their scheme and skipped out on the fair and ran away. So they, they did try to rob the original one. Then they decided to call a different cab to avoid detection. So this is not an isolated incident. This is something that they planned to do. And to be fair, yes, the fare was not particularly high, but these, these four, four individuals got together. And as defendants stated, they went on a mission. It was a premeditated plan to rob any cab driver of their money at gunpoints. They threatened to harm to whoever that individual was. When their first attempt failed, defendant could have stopped, you know, he chose not to, he continued to pursue this mission. And even during the crime, his role was to stand in hiding and wait in hiding with his gun and, and then ambush the cab driver. Again, he had an opportunity. That was his role. He wasn't in the cab with the driver. He could have withdrawn, but he chose not to. He continued this plan and tried to get the money. And eventually, you know, the evidence does show that he's the one that shot the cab driver. There are, you know, there are other sides to this, but this was at a sentencing hearing. The trial court was aware of all of these, all of these factors. Defense counsel elicited during cross-examination, the fact that the bullet was lost. Defense counsel, defense counsel discussed at the, you know, or elicited from detective Bullard, the relationship between the three other individuals. All of these facts were discussed and all of the mitigating factors were presented to the trial court. There were mitigating factors. The trial court discussed them, the trial court found them, but there were also these significant aggravating factors. And the standard that applies under our constitution is an abusive discretion standard. And so the court had to consider all of the factors, the seriousness of the offense, as well as defendant's rehabilitative potential. And the court did just that. It looked at all of the facts. It looked at how serious the crime was. It looked at some of the discrepancies in the evidence that counsel points out. But it ultimately concluded that this offense was serious, not serious, regardless of who fired that fatal shot. Defendant had a gun, according to Chris Wells. And Chris Wells also admitted that he fired. And Chris Wells' proposed testimony would have been the defendant fired a 22 and there was 22 caliber ammunition found underneath his bed. So there was corroboration for it. And we do have a state forensic lab report according to the record that shows that the victim was shot with a 22 and not a 380 as Chris Wells had. So ultimately, defendant fired and he was responsible for this man's death and he was a 75-year-old individual. And that's an aggravating factor. But nothing in our constitution required the trial court to impose a sentence of assuming this is life, of life only if defendant was incorrigible. There's no such finding. Our constitution requires an individualized sentencing hearing. That is what and it looked at everything and made its conclusion. I want to touch briefly on something I think we started with, which is about youthful offenders and how our constitution treats them. You know, at this point in time, there is a sharp distinction between juvenile offenders and young adult offenders. Our law draws that distinction. The legislature is perhaps moving towards, you know, treating young adults a little bit differently by granting them parole. But it's important that it only does, the legislature chose to do that only prospectively and it hasn't gone back and to revisit these sentences. Should it do that? You think in fairness? In fairness, you know, I think it's a provisions, you know, retroactive. It's within the legislative prerogative to do so. But, you know, the other component of this is that the legislature took lots of steps to reduce the minimums for juveniles and to require a Miller hearing for juveniles through the statutes. And it removed mandatory life, obviously, but it retained, you know, 40 years, but it didn't make those same changes for young adults. It didn't apply those provisions for young adults and it certainly could And so, and they continue to sentence young adults to mandatory life in certain circumstances, right? So the legislature has at least looked at this and continues to believe that's an appropriate sentence in the appropriate circumstances. And here, what we have is a, you know, the discretion of the trial court. The trial court looked at everything. His minimum was 20. His maximum was 60. The court looked at everything and made a determination. There's just no suggestion that this is clearly unconstitutional under the laws as they stand. You know, it appears that some of our brothers and sisters in the first district have, at least in cases of emerging adults, 18 to 20, determined that they have a right to a Miller-type hearing. Now, obviously, people versus house is still not decided by the Supreme Court, but is this a more enlightened approach? I think that's for perhaps the legislature of the Illinois Supreme Court to say at this point, right? I would say this. This court has already taken a look at house and already taken, you know, people versus green and then before that and people versus white. The court took a look at between, you know, mandatory and discretionary, but there is, I mean, we continue to draw the line at 18 for adulthood. The Eighth Amendment does it, you know, in our society does it. And so, you know, whether it's more enlightened, I think is a question for a different, you know, for the Illinois Supreme Court or for the legislature, but there is a split, you know, in the districts on this. The first district is split within itself. And so, this is an issue that I think the Illinois Supreme Court eventually might decide whether it happens in house or not is I'm not sure, but the court's aware of it and there are PLAs pending on it. So, I do think it will be addressed hopefully at some point, but at this point in time, this court's already, you know, declined to apply house to discretionary sentences. And as for whether, you know, whether we should extend juvenile sentencing provisions to young adults, you know, at this point we haven't and the country really hasn't. And so, I think it's perfectly acceptable or constitutional for the trial court to take a look at an individualized case and determine based on the facts of that case and the seriousness of the crime that a 50-year sentence is warranted. So, unless the court has any further questions, we'd emphasize that defendant, you know, there were a lot of aggravating factors here. At age 24, he chose to break his, you know, play bargain with the state and not cooperate. And he engaged in a very serious crime. And so, the trial court did not abuse its discretion in imposing a 50-year sentence. And certainly the sentence does not exceed constitutional limits. Let me ask you this about, you mentioned not cooperate, and I assume you're referring to his refusal to testify against the other individuals involved. But was it clear to him that he would be required to testify against the other people? I think what I read was that there was a commitment on his part to cooperate with law enforcement. It was not specifically spelled out that he would have to testify against the other people, which he was, I think, very hesitant to do from the start. Well, it's not one, Your Honor, it's not clear that he was hesitant from the start. Some of the reluctance and the citations to his reluctance to testify actually are post-plea evidence, because there are conversations with the assistant attorney general who didn't enter the case until 2016, until after he had already pled guilty. But in the plea hearing, and I'm just trying to find it here, the trial court did advise him that he both had to cooperate with law enforcement and testify at trials. And just based on the timing of this, so I think my time has run out. May I have a little bit more time? Sure, go ahead. Thank you. Thank you, Your Honor. I think, so just from the timing of this, a defendant was sentenced in May of 2017. At that point in time, Mark Taylor still had not gone to trial. Just to give you a little background on this, this court does have Chris Wells's and Mark Taylor's cases on appeal as well. And Chris Wells testified at Mark Taylor's trial, and that occurred in November of 2017. So defendant had been sentenced before that point and had to, and decided well before the trial that he just was not going to cooperate. So he did break the bargain. If there are no further questions, Your Honor, we ask the court to affirm the trial court's judgment. All right, thank you very much. And you may have some time and reply. Thanks, Your Honor. To quickly talk about the bargain portion of him testifying against his co-defendants, I believe DeMondros' plea counsel actually testified that he was aware of DeMondros' reluctance to testify against his co-defendants. And of course, plea counsel stated that he had a lot of clients and couldn't remember exactly what happened. But DeMondros states that plea counsel had told him prior that he wouldn't have to 100% testify against his co-defendants, that he wasn't a material witness. I don't know if the attorney was thinking that there were three other co-defendants, so he wasn't material, but DeMondros states that his plea attorney told him he wasn't a material witness. In which does dyslexia come into play as far as understanding all of this? So again, plea counsel stated that he knew DeMondros was dyslexic. It came out multiple times throughout his case. His mom specifically testified that that meant for him, he needed a little extra time for everything. So he needed someone to read it to him, to explain it to him, to help him understand. And it might be more than just his dyslexia, but he had an IEP as well. So I think his grandma also testified that because he was new to the criminal justice system, this was all new for him. He was having a hard time understanding. So, I mean, I think the dyslexia does come in to a part of his comprehension, or maybe the time that his attorney had to spend with him, which he is alleging that plea counsel didn't do that. And plea counsel stated that he didn't treat DeMondros or his dyslexia any different than other clients. He does testify to that. Do you think it's reasonable for an attorney of expected competency dealing with someone who has some form of a mental disability to maybe lead him on with a statement that I'm not a hundred percent certain that you're going to be called to testify, instead of explaining to him right off that you'd better do what they tell you to do. If they call you to testify, you better testify or else when sentencing comes around, this is going to be an aggravating factor that the judge is going to take into consideration and give you more time that you might get otherwise. I mean, I think your honor, you're correct. I believe that counsel should have been more upfront about this. And again, we kind of have, so I do want to kind of clarify a little bit. Plea counsel does state that he read, or he usually reads police reports to his clients. So he does state that, but also he adds on to that, that he didn't treat DeMondros any different than any of his other clients. And here we do get a glimpse of plea counsel, admitting to a certain degree that DeMondros was hesitant, that DeMondros was told that he might not have to testify. Even though as the state discusses the trial court and the prosecution did tell him that this was a part of the plea, but then you have your trusted counsel telling you, maybe it's not a hundred percent. I get that you're reluctant. You don't, you might not have to, you're not a material witness. So we have that as a part of our first argument in the motion to withdraw his guilty plea. But unless there's any questions, I do want to briefly touch on the sentencing arguments a little further. So just some last points. I do want to note for this court that notably cases that dealt with juveniles like Buffer and Davis and the Supreme court and Smalley and Sanders, these are all cases that are cited in our briefs where the defendants or the respondents were 16, 17, and 14. They were initially all given de facto life sentences or mandatory natural life sentences. And at one point that was accepted in our society. Now that's no longer the case. And as the state and your honors discussed, our, our society is moving towards accepting emerging adults or late teenagers like DeMondros in this, in this little bubble, treat them like juveniles, because at one point juveniles were allowed to, you know, kind of rot in prison as well. That's no longer the case. And we're, we're moving towards that, that area where, you know, 18 year olds like you or like DeMondros is no longer, or should no longer be allowed to, you know, die in prison. And I want to point this court to the second district in Suggs. They, they quote saying, you know, an 18 year old defendant, um, it's, it's a mere small step to get to an 18 year old defendant to treat them like juveniles. It's a bigger step or a bigger leap for, you know, 21 year olds, or as they get closer to 25, but DeMondros is right on that line at 18. And DeMondros asked this court to, um, find that his sentence is either unconstitutional or excessive and, uh, grant him a new sentencing hearing. Unless there's any other questions. No question. All right. Your honors. Thank you both very much. The court will take this into consideration and issue its ruling in due course. You guys have a nice day. Thank you.